Filed 7/8/13  P. v. Fletcher CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B234595 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA331552) |
| JAMES FLETCHER et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County. Sam Ohta, Judge.  Affirmed as modified.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant James Fletcher.

Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant Jerry Burke.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Noah P. Hill, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant James Fletcher of one count of attempted murder (Pen. Code, §§ 664/187)[1] (count 1) and one count of voluntary manslaughter as a lesser included offense of murder (§ 187) (count 6). The jury found that Fletcher committed count 1 willfully, deliberately, and with premeditation, and it found the firearm and gang enhancement allegations true as to that count. (§§ 12022.53, subds. (b), (c), (d) & (e)(1), 186.22, subd. (b).) The jury found that Fletcher personally used a firearm during the commission of count 6. (§ 12022.5, subd. (a)).

A jury convicted defendant Jerry Burke of two counts of attempted murder (§§ 664/187) (counts 2 & 3). The jury found that counts 2 and 3 were committed willfully, deliberately, and with premeditation, and it found the gang enhancement allegations to be true (§ 186.22, subd. (b)). In both counts 2 and 3, the jury found true the allegation that a principal personally discharged a firearm within the meaning of section 12022.53, subdivisions (b), (c), and (e)(1), but not true as to subdivision (d) of that statute.

The trial court sentenced Fletcher to life with the possibility of parole in count 1, plus a consecutive term of 25 years to life pursuant to section 12022.53, subdivisions (d) and (e)(1). In count 6, the trial court imposed a consecutive upper term of 11 years plus a consecutive 10-year firearm enhancement pursuant to section 12022.5, subdivision (a).

The trial court sentenced Burke to life with the possibility of parole in count 2. The court added a consecutive term of 20 years pursuant to section 12022.53, subdivisions (c) and (e)(1). The trial court imposed an identical concurrent term in count 3.

---

[1]     All further references to statutes are to the Penal Code unless stated otherwise.

Fletcher appeals on the grounds that: (1) the evidence was insufficient to support the finding that the attempted murder in count 1 was willful, deliberate, and premeditated; and (2) he is entitled to two additional days of presentence custody credit.[2]

Burke appeals on the grounds that: (1) the evidence was insufficient to support the findings that the attempted murders charged in counts 2 and 3 were willful, deliberate, and premeditated; and (2) he was denied his Sixth Amendment right to competent counsel because his trial attorney should have requested an instruction on provocation and advocated for second degree attempted murder.

Fletcher and Burke join in any of each other's arguments that may accrue to their benefit.

## FACTS

**Prosecution Evidence**

The offenses with which defendants were charged are described in chronological order. We include a brief summary of the offenses that the jury found were not proven beyond a reasonable doubt, since they played a role in the investigation.

*Count 6: Shooting of Victim Rhaburn (Fletcher Convicted of Voluntary Manslaughter)*

Officer Bryan Delavan of the Los Angeles Police Department (LAPD) responded to a radio call regarding a shooting at the intersection of Coco Avenue and Pinafore Street in Los Angeles at approximately 5:30 a.m. on August 26, 2007. Officer Delavan arrived at the scene and saw a car with its lights on and the engine running. The car contained the body of an individual. The victim, later identified as Eligah Rhaburn, was sitting in the driver's seat and had several gunshot wounds, including one near the back of the head. The victim's car had crashed into a parked minivan at the curb. The driver's side window and left rear window of the vehicle had been shot out, and the right front passenger window of the vehicle had shattered. An autopsy revealed that Rhaburn died

---

[2]    Fletcher has also filed a petition for writ of habeas corpus in case No. B241174 in which he alleges ineffective assistance of trial counsel. The petition will be considered concurrently with, but separately from, the instant appeal.

of multiple gunshot wounds and had suffered seven such wounds. The pathologist believed Rhaburn was shot from the driver's side of his vehicle.

LAPD Detectives James Yoshida and Richard Gordon responded to the scene later that morning. Detective Yoshida found 11 spent .45-caliber cartridge casings at the scene. Detective Yoshida also found three expended bullets at the scene—two on Pinafore Street and one near Mr. Rhaburn's vehicle.

LAPD criminalist Vanessa Gould conducted a bullet path analysis on Rhaburn's vehicle. She noted approximately 14 impacts to the vehicle. The pathways of all the bullets originated on the left side of Rhaburn's car and moved from front to back.

Rhaburn was shot in a residential neighborhood of South Los Angeles that is often referred to as "the jungle." The neighborhood is claimed as the territory of the Black P-Stone Bloods criminal street gang. Rhaburn was a member of the Black P-Stone Bloods.

*Counts 2 and 3, Victims Erwin and Mario Alvarado (Burke Convicted of Attempted Murder; Fletcher Acquitted)*

On September 20, 2007, at approximately 1:45 a.m., Erwin Alvarado was driving his Ford Explorer on Westhaven Street in Los Angeles. Erwin's cousin, Mario Alvarado, was in the front passenger seat of the vehicle. [3] Erwin and Mario were not gang members, and they were unarmed. As Erwin approached Redondo Boulevard, he saw that two cars were blocking the street and not letting cars pass through. There was a white Toyota Camry with tinted windows double parked in the street directly behind a white Chevrolet Impala. Erwin moved closer so that people could see he was trying to get through.

Erwin recalled that at least three Black males approached him and Mario, and one of them pulled out a gun and shot at them from a distance of two car lengths. Then the other two men began shooting at Erwin and Mario also. Erwin put his head down and began reversing the Explorer. At one point, he looked up and a bullet grazed his

---

[3] Because Erwin and Mario Alvarado have the same last name, we refer to them by their first names.

4

forehead. Erwin collided with a couple of cars as he reversed. When he looked up, the shooting had stopped and it looked like the shooters had gone. Erwin drove to his aunt's house and she called the police. He and Mario were taken to a hospital.

Mario recalled that a Black male approached the car and asked Mario what he was doing there. When Mario said he was going home, the man said, "Just leave." Erwin began to reverse the Explorer, and some other man got out of a vehicle and said, "Yeah. It's them," and "They're from 18th Street." Mario recognized that man because he used to be Mario's next-door neighbor. Mario knew him as "Jerry." At trial, Mario indicated that the man was Burke. The man on the sidewalk was dark-skinned and wore braids. There was a third man as well. After Burke made the remark about 18th Street, he and the man on the sidewalk, whom Mario identified at trial as Fletcher, started shooting at Mario and Erwin with a .45-caliber weapon. Burke shot into the front of the Explorer, and the other man into the passenger side. The Explorer was hit by 12 bullets. Mario was struck by a bullet from the man on the sidewalk. Mario suffered a through-and-through wound in his forearm and one just above his stomach. A bullet is still inside his body.

LAPD Officer Alfredo Ibanez responded to a radio call regarding the shooting and arrived at the scene at approximately 1:50 a.m. Officer Ibanez recovered 17 spent .45-caliber shell casings and four expended .45-caliber bullets from the intersection.

Although Mario was not a gang member, he knew that the 18th Street gang claimed the area where he lived, and he knew some of the gang's members. He knew that the Geer Street Crips inhabited the same area. Mario had seen Burke almost daily when they were neighbors. He described their former relationship as a friendship. Mario was shown a six-pack and circled Burke's photograph. He wrote that "The person, No. 4, was the one that said, yes, they're from 18th Street and started shooting at us."

At trial, Mario at first denied that he had previously told police he could not identify Burke. He later acknowledged that he told police at first he did not remember anything and could not identify anyone. He delayed because he was scared. The first time he identified Fletcher was at trial. He then said he was "kind of" not really sure

Fletcher was there. Mario testified that the Chevrolet Impala depicted in the photograph that LAPD Detective Charles Geiger had shown him was not the same vehicle that had been parked in front of the Camry on the night of the shooting.

Detective Geiger heard about the Alvarado shooting a couple of days after it occurred. When he interviewed Mario at his residence, Mario was cooperative but scared. He told Detective Geiger that he did not get a very good look at anyone during the shooting. In a second interview, when shown a picture of a Chevrolet Impala, Mario said it looked like one of the cars used by the suspects. Mario changed his story that day and told Detective Geiger that he had been afraid to say anything, but he recognized one of the people involved in the shooting as a person he knew as Jerry, who had lived next door to him. Mario knew Jerry was a Geer Gangster Crip. Detective Geiger showed Mario a six-pack containing a photo of Fletcher, but Mario was unable to identify anyone.

Mario had previously lived in the 2300 block of South Ridgeley Drive in Los Angeles. In 2004, Burke told police officers that he lived in the 2300 block of South Ridgeley Drive in Los Angeles. Mario had moved away from Burke's neighborhood sometime prior to the shooting.

*Count 1: The Shooting of Victim Campos (Fletcher Convicted of Attempted Murder)*

On the same day as the Alvarado shootings, at approximately noon, Victor Campos was standing and speaking with a neighbor outside his apartment building, which was located near the intersection of Carlin Street and Hauser Boulevard in Los Angeles. This area is 18th Street gang territory, although the Geer Street Crips share some of the same area. Campos is not a gang member. A silver or gray Impala with two Black occupants approached. Campos stared at the car. He clearly heard one of the occupants say, "Fuck 18th Street." The passenger shot at Campos with either a .45-caliber or a .22-caliber handgun. Campos looked at the shooter's face, but at the preliminary hearing and at trial he was unable to identify anyone. He denied being afraid because it was a gang case. Campos suffered a through-and-through wound in the back in the area of his shoulder.

6

A few days later, Campos looked at some photographs after being admonished by detectives. Campos chose picture No. 3 in a photographic lineup (six-pack) (People's Exh. No. 95), and wrote, "person picture 3, the shooter." Picture No. 3 was a picture of Fletcher. At trial, Campos stated that "it looked like him at the moment." At the preliminary hearing, Campos testified that he identified the person in the picture from the braids the person wore rather than the face. Campos was shown a picture of a gray Impala (People's Exh. No. 74). He testified that he told police "it looked like the car of that day."

Detective Geiger responded to a radio call regarding the Campos shooting. He found a blood trail and one expended .45-caliber shell casing under a truck parked on the street. Detective Geiger met with Campos at the hospital, and he later interviewed Campos and showed him a six-pack. Campos circled Fletcher's picture and indicated that Fletcher, in picture No. 3, was the person who shot him. Campos did not say "'maybe.'" When Campos saw the picture of the gray Impala, he said, "That's the car."

The jury heard a recording of a 911 call reporting the shooting, and jurors were given transcripts of the call. The anonymous caller told the 911 operator that someone had shot two to three times from a silver Chevrolet with no license plate.

*Counts 4 and 5, Victims Rudy Chavez and Gustavo Guzman (Fletcher Acquitted of Attempted Murders)*

Five days after the Alvarado and Campos shootings, at approximately 1:46 p.m., a 911 dispatcher received an anonymous call about shots fired on Westhaven Street near Redondo Boulevard. The caller saw a white Chevrolet Malibu fleeing the area. The car appeared to have two male Black occupants. LAPD Officer William Corona responded to the shooting scene. He saw debris from an auto accident, including the grill assembly and rear bumper from a Chevrolet sedan. The bumper had a black paper plate on it. The license plate frame read, "Torrance, Martin Chevrolet." Officer Corona found eight shell casings in the intersection. Seven of the casings were from a nine-millimeter handgun and one was from a .45-caliber handgun. Officer Corona located 11 more shell casings farther down the street.

7

A witness approached Officer Corona at the crime scene and said he heard five to six rapid shots from his second-floor apartment. He saw a silver sedan speeding eastbound on Westhaven Street. At the intersection with Redondo Boulevard, the silver car collided with a green car. The driver of the green car, a male Black, got out and shot at the silver car. The driver of the silver car, a male Hispanic, started shooting back.

At approximately 2:00 p.m. on the day of this incident, LAPD Officer Sung Yoon went to a hospital located one mile from the intersection of Redondo Boulevard and Westhaven Street on an unrelated matter. Upon leaving the emergency room, Officer Yoon saw Rudy Chavez and Gustavo Guzman walking towards the hospital from a tan Lincoln LS. Chavez had his arm around Guzman and appeared to be in pain. Guzman told Officer Yoon that Chavez had been shot in his right leg. Chavez and Guzman told Officer Yoon differing versions of what had occurred.

Neither Chavez nor Guzman, who were 18th Street gang members, testified at trial. Detective Geiger was unable to locate either victim for trial or for Fletcher's preliminary hearing.

*The Investigation Leading to Defendants*

On September 19, 2007, Detective Geiger interviewed Demario Green, a member of the Geer Gang Crips who had been arrested for robbery. Detective Geiger asked Green for information about members of the Geer Gang Crips who were committing shootings in the community. Green told the detective that one of them was known as "Smurf." Detective Geiger determined that Fletcher was a Geer Gang Crip known as "Smurf."

The day before the Chavez shooting, Detective Geiger conducted surveillance outside of 3460 Hyde Park Boulevard in Los Angeles.[4] Detective Geiger photographed a silver Chevrolet Impala outside of the residence. He also saw a gray Chevrolet Monte Carlo parked outside. Detective Geiger saw Fletcher get into the Impala later that day. A

---

[4]     Fletcher's girlfriend testified that Fletcher lived at this address.

bumper found at the intersection of Redondo Boulevard and Westhaven Street following the shooting of Chavez appeared to be the same bumper the detective saw on the Chevrolet Impala parked in front of Fletcher's apartment building. It was the same color and had the same license plate frame and paper plate.

Fletcher was the registered owner of a Chevrolet Monte Carlo. The address listed on appellant Fletcher's vehicle registration was 3207 West Adams Boulevard in Los Angeles.[5] On September 27, 2007, LAPD Sergeant Kenneth Schmidt executed a search warrant at an apartment located at 3207 West Adams Boulevard. Sergeant Schmidt found a semiautomatic .45-caliber firearm underneath a couch cushion. It was a Millennium .45-caliber Taurus. He also found a letter bearing the name of James Fletcher. The firearm was fully loaded, with 10 rounds in the magazine and one in the chamber.

LAPD criminalist Stella Chu examined the weapon recovered from Fletcher's residence and test-fired the weapon. Chu compared the expended bullets and casings to those recovered during the shootings charged in the instant case. The testing showed that the gun found in Fletcher's residence had discharged all of the ballistic evidence found after the shootings of Rhaburn and Campos. Seven of the 17 shell casings recovered in the Alvarado shooting had been discharged from the weapon found in Fletcher's residence, and 10 of those shell casings were fired from a second weapon. Chu determined that the .45-caliber casing found at the Chavez shooting scene had been fired from the weapon found in Fletcher's residence.

On November 16, 2007, LAPD Detectives Sean Hansen and Richard Gordon interviewed Green, who was in custody. The jury saw still photographs taken from the video of Green's interview and heard a redacted audio-recording of the interview. Green said that on the morning of Rhaburn's shooting, Fletcher, known as "Smurf" and "Little Smiley," asked Green if he could leave his gun at Green's house because the gun was

---

[5]     Fletcher also used the West Adams Boulevard address.

"hot." Fletcher did not leave the gun at Green's because Green told him the police had recently been there. Fletcher said he would take the gun to his mother's house. The gun was a .45-caliber Millennium. Fletcher told Green he had shot someone. Fletcher said he had been driving to his girlfriend's residence when a Black man in a car "rolled up on him." Fletcher thought the man was a Blood and was going to shoot him. Fletcher shot at the man repeatedly and the man's car crashed into another car. Green identified Fletcher from a six-pack. Green identified a photograph of Burke in a different six-pack and said he knew him as Jay Loc.

Green was called to testify at trial but he at first refused and was found in contempt of court. He later agreed to testify under an immunity agreement. He denied he was asked about the shooting on Coco Avenue and Pinafore Street. He denied knowing the defendants. He denied saying everything he told the officers in his interview. On cross-examination, Green said he made statements to get money and was promised he would not be charged with a robbery. Green claimed he made up the information he told the officers. He also claimed he was told what to say.

*Gang Evidence*

LAPD Detective David Dilkes testified as a gang expert. He stated that the Black P-Stones are a Blood gang. The Geer Gang Crips are rivals of the P-Stones and of the 18th Streeters, a Hispanic gang. The primary activities of the Geer Gang Crips are the sale of narcotics, drive-by shootings, and assaults with deadly weapons. Detective Dilkes testified about the 2005 felony convictions of two Geer Gang Crips members. Fletcher and Burke are members of the Geer Gang Crips. Fletcher has the monikers of "Little Smiley" and "Smurf." Burke is known as "J-Loc" or "Blue."

Detective Dilkes explained that the intersection of Coco Avenue and Pinafore Street is in Black P-Stone Bloods' territory. Rhaburn was a member of the Black P-Stones, but he was not an active member. The 18th Street gang is a Hispanic criminal street gang that claims roughly the same territory as the Geer Gang Crips. The 18th Street gang is much larger than the Geer Gang Crips. The two gangs were at war in

10

2007.  Detective Dikes believed that the intersections where the Campos, Alvarado, and Chavez shootings occurred are all "stronghold" areas of the 18th Street gang.

Deputy Dilkes explained that, due to the danger involved, a gang member can greatly raise his status within his gang by going into a rival gang's territory and shooting a rival gang member or someone who appears to be a rival gang member.  A gang member can also raise his status by shooting a rival gang member or someone he believes to be a rival gang member when that person is present in the shooter's territory.  When presented with a hypothetical based on the facts of the instant case, Deputy Dilkes was of the opinion that each of the shootings was committed for the benefit of, or in association with, a criminal street gang.

**Defense Evidence (Fletcher)**

Dr. Mitchell Eisen , a psychologist, testified as an expert on the subject of memory.  Dr. Eisen explained that we have limits on our attentional capacity.  A person remembers the major features of important events and fills in the gaps by using inference to complete the picture.  At times the inferences are mistaken.  Once an individual has reconstructed a memory, the most recently reconstructed version is the one the person will access the next time he or she accesses that memory.  Traumatic stress causes one to focus on the central elements of the experience, i.e., what is necessary to surviving the event.  The focus will differ among individuals, but focus on a brandished weapon is very common.

Dr. Eisen explained that if someone does not recognize a photograph in a six-pack immediately, they persevere and pick the closest one.  If a witness indentifies someone, whether correctly or incorrectly, the witness may continue to choose that person in the future.  The memory errors Dr. Eisen described occur when people are doing their best to be accurate.  Dr. Eisen stated that there is no relation between witness confidence and witness accuracy, and people become more certain about their identification over time.  Dr. Eisen offered no opinion on the accuracy of any identification of Fletcher or Burke made by any witness in the case.

11

Ebony Clarke is the mother of Fletcher's son. Clarke and Fletcher were not living together in 2007. Fletcher drove a gray Monte Carlo, and Clarke had never seen him drive another type of car. Fletcher lived at 3460 Hyde Park Boulevard but he was sometimes at his mother's house. Fletcher always picked up their son at preschool Tuesdays through Thursdays between 2:30 or 3:00 p.m.

Kimi Lent is a gang intervention specialist who testified as a gang expert. To her knowledge, Eligah Rhaburn was not a Black P-Stone gang member. Lent had met with Fletcher and knew he had a long history of being a Geer Gang Crip member. Lent stated that the Black gangs engage in less rivalry because their main rival is the 18th Street gang. It is a common practice for gang members to pass around guns. They also pass around cars, including rented or stolen cars. She stated there are more personal shootings than gang-related shootings in the gang neighborhoods, even though a gang member may be the shooter. Lent said that there is animosity between the Geer Gang and the 18th Street gang. Lent agreed that if a Geer Gang member saw someone who appeared to be from 18th Street and then pulled out a gun and shot that person in the back while yelling "Fuck 18th Street," it would demonstrate that the Geer Gang member had hostility towards 18th Street. The same would be true if someone said "They're from 18th Street" and began shooting into a car.

David Terrell was a member of the Black P-Stone Bloods. He knew Fletcher from a gang intervention program, from gang banging when they were active, and from being with him in prison and juvenile hall. Terrell knew Fletcher to be a member of the Geer Gang Crips who used the moniker, "Little Smiley." Fletcher had always driven a Monte Carlo. Terrell and Fletcher had been enemies at one time, but Fletcher had a "pass" to go to the Black P-Stone's area. In other words, Fletcher could enter rival gang territory without the threat of violence, and he did so on many occasions.

Terrell stated that gang members pass around guns and cars. To Terrell's knowledge, Eligah Rhaburn was not a Black P-Stone. Rhaburn's tattoos were not related to the Black P-Stone Bloods. According to Terrell, the Geer Gang Crips are not rivals of the Black P-Stones; rather, they have been allies for about 10 years. At the time of his

12

testimony, Terrell was in custody on a parole violation. He had suffered a conviction for possession of a firearm and had violated his parole condition that prohibited him from associating with other gang members. Terrell had seen appellant Fletcher in custody every day prior to trial, and they had engaged in brief conversations.

DNA tests performed on swabs taken from the firearm recovered from the residence of Fletcher's mother demonstrated that his DNA was inconsistent with the profiles obtained from the weapon, which were of two different individuals. Burke could not be excluded as a contributor to the DNA profile found on the weapon. It was possible that the criminalist who test-fired the weapon contributed to the DNA profile. DNA is not always left on the surface of a handgun after it has been used, and DNA evidence can be wiped away.

LAPD Criminalist Margaret Kaleuati analyzed the gunshot residue evidence taken from Rhaburn's hands. The tests showed that Rhaburn had particles on his right hand that were consistent with gunshot residue. This residue could have been the result of being within 14 feet of a gun being shot. Kaleuati explained that is common to find gunshot residue on a shooting victim.

LAPD Detective Brandy Arzate determined that the bumper found in the intersection of Redondo Boulevard and Westhaven Street following the incident with Guzman and Chavez bore a license plate frame that read, "Torrance, Martin Chevrolet." The paper plate read, "Melika Auto Sales." The sales records of Melika Auto Sales showed that a car that was a close match to the silver or gray Impala was sold, but without the vehicle identification number, there was no ability to compare it to the car Detective Geiger had seen Fletcher driving.

Mark Cova managed the account services department at Westcom Credit Union. Fletcher obtained a loan on March 16, 2007, to purchase a 2005 Chevrolet Monte Carlo from Melika Auto Sales. A Jason Johnson purchased a 2006 Chevrolet Impala. Fletcher listed his home address as 3207 West Adams Boulevard in Los Angeles on the financing contract.

13

**Defense Evidence (Burke)**

Burke did not testify on his own behalf and presented no affirmative evidence.

**DISCUSSION**

## I. Sufficiency of the Evidence of Willful, Deliberate, and Premeditated Attempted Murder (Count 1)

### A. Fletcher's Argument

Fletcher contends that, assuming he was the shooter, no rational trier of fact could have found beyond a reasonable doubt that the attempted murder of Campos was willful, deliberate, and premeditated. There was no credible evidence of any planning activity or motive to support the finding. Fletcher asserts that not every drive-by shooting involving a gang member meets the requirements to impose a life sentence.

### B. Relevant Authority

Attempted murder requires express malice, and, on appeal, we do not distinguish between attempted murder and completed first degree murder to determine whether there is sufficient evidence to support the finding of premeditation and deliberation. (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1462, fn. 8, disapproved on another point in *People v. Mesa* (2012) 54 Cal.4th 191, 199.)

"Review on appeal of the sufficiency of the evidence supporting the finding of premeditated and deliberate murder involves consideration of the evidence presented and all logical inferences from that evidence in light of the legal definition of premeditation and deliberation . . . . Settled principles of appellate review require us to review the entire record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—from which a reasonable trier of fact could find that the defendant premeditated and deliberated beyond a reasonable doubt. [Citations.]" (*People v. Perez* (1992) 2 Cal.4th 1117, 1124 (*Perez*).) The hurdle to secure a reversal is just as high when the prosecution's case depends on circumstantial evidence. (*People v. Stanley* (1995) 10 Cal.4th 764, 792.) As long as there is reasonable justification for the findings

made by the trier of fact, a reviewing court's opinion that contrary findings might also have been reasonable does not require a reversal. (*Id*. at p. 793.)

There are three basic, but not exhaustive, categories of evidence that will sustain a finding of premeditation and deliberation: (1) planning activity; (2) motive; and (3) manner of the killing. (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*); see also *Perez*, *supra*, 2 Cal.4th at p. 1125.) These factors are not elements that need be present to sustain a finding of premeditation and deliberation and are by no means the exclusive means of showing premeditation. (*Perez*, at p. 1125; see also *People v. Pride* (1992) 3 Cal.4th 195, 247.) The *Anderson* factors are merely, as stated, categories of evidence to be used as a framework in the analysis of the sufficiency of the evidence of premeditation and deliberation. (See *Perez*, at p. 1125; *People v. Thomas* (1992) 2 Cal.4th 489, 517.)

CALJIC No. 8.20 has been held to correctly define "deliberate and premeditated murder." (*People v. Goldbach* (1972) 27 Cal.App.3d 563, 569.) CALJIC No. 8.67, which addresses willful, deliberate, and premeditated attempted murder is almost identical to CALJIC No. 8.20 and defines the terms in the same manner. CALJIC No. 8.67 defines "willful" to mean "intentional," and "deliberate" to mean "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." The word "premeditated" means "considered beforehand." CALJIC No. 8.67 instructed the jury that "[t]o constitute willful, deliberate, and premeditated attempted murder, the would-be slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decides to kill and makes a direct but ineffectual act to kill another human being." The instruction also states: "The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation."

15

### C. Evidence Sufficient

Fletcher particularly disputes the existence of the first and second *Anderson* factors, which focus on planning activity and motive on the part of the perpetrator. We disagree with Fletcher and believe there is ample evidence from which a reasonable jury could conclude that Fletcher acted willfully and with premeditation and deliberation.

With respect to planning activity, Fletcher armed himself with a firearm and rode with a companion into the territory of a gang with which his gang was at war. Fletcher is a Geer Gang Crip, and the territory where Campos lived was claimed as the territory of the 18th Street Blood gang. When they were within 15 feet of Campos, they shouted "Fuck the 18th Street" and began shooting at Campos. A reasonable jury could infer that this excursion into enemy territory by Fletcher and his companion was planned. Although Fletcher presented evidence that he had a "pass" to go into 18th Street territory, a reasonable jury could conclude that Fletcher had no purpose for being in the area except to search for a victim. In any event, the fact that he shouted "Fuck the 18th Street" before shooting at Campos demonstrates that he had a preconceived willingness to shoot at his victim, regardless of how long he deliberated his action. As the jury was instructed, premeditation and deliberation are not measured by the duration of time. (*People v. Bolin* (1998) 18 Cal.4th 297, 332; CALJIC No. 8.20.) CALJIC No. 8.67 informed the jury that: "The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances." Fletcher may have arrived at his decision to commit the act in a short period of time, but his act does not bear the characteristics of a rash impulse. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 849 [in context of shooting between two armed rival gang members, premeditation can be established even though the time between sighting and shooting is very brief].)

Moreover, Fletcher took care not to use his own car in the shooting, and he fled after the victim ran for cover. (See *People v. Morris* (1988) 46 Cal.3d 1, 23 [defendant's possession of a weapon in advance of the shooting and his rapid escape support inference

16

of planning activity], disapproved on another point in *In re Sassounian* (1995) 9 Cal.4th 535, 543-544, fn. 5.) Although there was no evidence of a specific plot, the fact that elaborate planning activity is not in evidence does not foreclose a finding of sufficient evidence of premeditation. (*People v. Millwee* (1998) 18 Cal.4th 96, 134.)

Furthermore, there was sufficient evidence of motive supplied by Fletcher's shouted slogan, which showed that the shooting was intended to enhance the power and status of his gang over that of the 18th Street gang. At the time of the shooting, his gang and the 18th Street gang were enemies. When given a hypothetical that mirrored the facts of the Campos shooting, the gang expert testified that a shooting of this type "absolutely was for the benefit of the gang." The shooter and the driver were "establishing themselves" and yelling out the gang name for the victim and other members of the community to hear. The fact that African-American gang members from the Geer Gang were "rolling through" and shooting at Hispanics raised the fear level of the community and raised the status of the Geer Gang, showing other gangs and the neighborhood residents that they are dominant. Although no personal motive for shooting Campos in particular was shown, the absence of such a motive is not dispositive. (See *People v. Thomas*, *supra*, 2 Cal.4th at p. 519 [even a random, but premeditated, killing supports a verdict of first degree murder].)

The nature of the attempted killing also showed premeditation and deliberation. Fletcher fired at Campos and hit him in the back from a distance of approximately 15 feet. This demonstrates that, although Fletcher may not be a good marksman, "the *manner* of killing was so particular and exacting that the defendant must have intentionally killed [or attempted to kill] according to a 'preconceived design.'" (*Anderson*, *supra*, 70 Cal.2d at p.27; see also *People v. Caro* (1988) 46 Cal.3d 1035, 1050.) It has been held that the method of killing alone may be sufficient to find premeditation and deliberation. (*People v. Memro* (1995) 11 Cal.4th 786, 863-864, disapproved on another point in *People v. McKinnon* (2011) 52 Cal.4th 610, 639.)

Under these criteria, the jury reasonably determined that the shooting of Campos was premeditated and deliberate. Fletcher's argument that there was insufficient evidence of premeditation and deliberation is without merit.

## II. Sufficiency of the Evidence of Willful, Deliberate, and Premeditated Attempted Murder (Counts 2 and 3)

### A. Burke's Argument

Burke contends that there was no evidence of planning activity or motive in the shootings of Mario and Erwin. According to Burke, there was also no evidence that the nature of the shootings established premeditation and deliberation. Therefore, there was insufficient evidence of premeditation and deliberation, and the true findings must be reversed.

### B. Relevant Authority

In the first portion of this opinion, we recite authority relevant to the issues of premeditation and deliberation with respect to attempted murder.

### C. Evidence Sufficient

According to Burke, although the prosecutor suggested that Burke went into the 18th Street gang's territory looking to shoot a rival gang member, there is no evidence to support that theory. There is no evidence Burke drove to Westhaven Street looking to shoot anyone at all. In addition, the brief time it took for the incident to unfold does not support a reasonable inference that Burke had formed and was carrying out a plan. There was no evidence that Burke brought the gun with him for the purpose of shooting someone. With respect to motive, the record is devoid of evidence establishing a motive to kill, and in fact establishes the opposite, since Mario testified that he and Burke were former friends. Burke did not know Erwin and thus had no motive to kill him either. Moreover, Erwin and Mario approached Burke, and his statement ("That's them . . .") showed he believed he was being ambushed by rival gang members. He was hastily reacting to a rapidly unfolding situation. Finally, Burke asserts that he fired in a haphazard manner, and the manner in which the shooting occurred fits the description of a rash and impulsive shooting without deliberation or reflection.

18

We disagree and conclude that the record provided substantial evidence of premeditation and deliberation on the part of Burke and his co-perpetrators. Mario and Erwin were not gang members and were unarmed. They were merely trying to return home when they encountered what amounted to a roadblock. As Erwin stated, he moved the Explorer closer to the obstructing vehicles so that whoever was blocking the street could see that he was trying to get through. Three African-American males approached Erwin's car. One pulled out a gun and shot at him and his cousin, Mario, and then the others began shooting at them also. One of the bullets scraped Erwin's forehead. Before the first man shot, he asked Mario what they were doing there. Mario said they were going home, and the man said, "Just leave." When Erwin began to reverse, another man, later identified as Burke, got out of a car and said, "Yeah. It's them," and "They're from 18th Street."

The fact that Burke stated, "It's them," indicates that the shooting that ensued was enough of a considered decision to be classified as premeditated and deliberate rather than a rash act. The fact that the incident happened very quickly does not preclude premeditation and deliberation on Burke's part, especially when Burke identified the cousins as rival gang members. (See *People v. Sanchez*, *supra*, 26 Cal.4th at p. 849.) A cold, calculated judgment may be arrived at quickly. (*People v. Bolin*, *supra*, 18 Cal.4th at p. 332.) Moreover, the jury could have reasonably drawn the conclusion that the street was partially blocked as part of a plan to slow down cars in order to identify rival gang members. Deputy Dilkes testified that the intersection where the shooting occurred was a "stronghold" of the 18th Street gang. Burke's statement that, "They're from 18th Street" is clearly indicative of a gang motive on his part. Finally, the manner of the shooting decisively reflects premeditation and deliberation. A total of 17 bullets were fired at the two unarmed men by three persons. According to Mario, this occurred while Erwin was reversing his vehicle in order to get away. Mario was hit in the torso and Erwin came extremely close to getting a bullet in the head. The shooting was anything but haphazard. No reasonable jury could have believed that the three men, including Burke, believed they were about to be ambushed. Erwin purposely made himself visible so that he might

19

be able to pass the stopped vehicles, and neither Mario nor Erwin brandished a weapon or said anything to the waiting men except that they wanted to go home.

Burke's argument is without merit, and there was sufficient evidence that the attempted murders were willful, premeditated and deliberate.

## III. Alleged Ineffective Assistance of Burke's Counsel

### A. Burke's Argument

Burke asserts that, if this court does not reverse the true finding on the premeditation and deliberation enhancement in counts 2 and 3 for insufficient evidence, the finding must nevertheless be reversed because Burke was denied his Sixth Amendment right to effective counsel. Burke contends his trial counsel was prejudicially ineffective in not requesting an instruction on provocation and subjective heat of passion in the form of CALJIC No. 8.73[6] and in failing to argue for a second degree attempted murder conviction based on unreasonable heat of passion. Counsel's ineffectiveness was prejudicial because it resulted in the withdrawal of a potentially meritorious defense.

### B. Relevant Authority

Provocation that is insufficient to reduce murder to manslaughter may be sufficient to reduce first degree murder to second degree murder. (See *People v. Thomas* (1945) 25 Cal.2d 880, 903.) Only the defendant's subjective state of mind must be considered in determining whether provocation resulting in heat of passion precluded deliberation and premeditation. (*People v. Padilla* (2002) 103 Cal.App.4th 675, 678.) A defendant must show not only that he was provoked but that he acted while his reason was obscured by passion at the time of the act. (*People v. Sedeno* (1974) 10 Cal.3d 703, 719, disapproved on another point in *People v. Blakeley* (2000) 23 Cal.4th 82, 89.)

---

[6] CALJIC No. 8.73 provides, "If the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation."

"The standards for ineffective assistance of counsel claims are well established. 'We presume that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions.' [Citation.] To establish a meritorious claim of ineffective assistance, defendant 'must establish either: (1) As a result of counsel's performance, the prosecution's case was not subjected to meaningful adversarial testing, in which case there is a presumption that the result is unreliable and prejudice need not be affirmatively shown [citations] or (2) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome. [Citations].' [Citation.]" (*People v. Prieto* (2003) 30 Cal.4th 226, 261.) Also, "if the record does not preclude a satisfactory explanation for counsel's actions, we will not, on appeal, find that trial counsel acted deficiently." (*People v. Stewart* (2004) 33 Cal.4th 425, 459; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.)

### C. No Ineffective Assistance

Burke asserts that the evidence supports a verdict of second degree attempted murder because Erwin and Mario "drove up on him and his friends in the middle of the night." According to Burke, his statement ("That's them. They're 18th Street.") demonstrates his belief that he and his friends were being ambushed. Because the vehicle was positioned with the headlights pointed at Burke and his companions, Erwin and Mario had a visual advantage. Under these circumstances, and considering the gang rivalry, Burke could have interpreted this conduct as a provocative act. Burke repeats that he fired quickly and in a haphazard manner and asserts this is consistent with someone acting in a heat of passion.

Burke additionally argues that merely trying to impeach Mario's identification of Burke was not a reasonable defense, since Mario had no motive to implicate Burke, with whom he was familiar, in the shooting. This defense left the jury with the unreasonable choice between first degree attempted murder and an acquittal. Competent counsel would have disputed premeditation and deliberation rather than gamble on an acquittal,

21

and such an unsound strategy is not entitled to deference.  Burke contends that the jury would have returned a verdict of second degree attempted murder had counsel requested the provocation instruction and argued that Burke was subjectively under the heat of passion when he fired.

At the outset, in presenting a defense of mistaken identity to the jury, defense counsel argued vehemently that Mario had lied about his identification of Burke. Counsel pointed out that nothing corroborated Mario's identification and that Mario had denied three times that he recognized any of the shooters.  He argued that Burke knew Mario was not a member of the 18th Street gang and had no reason to harm him. Counsel argued that there was possibly someone else with light skin who might be a gang member and who would say something about 18th Street and start shooting.  All of these arguments would have rung hollow had defense counsel then argued that Burke was provoked and shot at the cousins in a heat of passion.  It is not an unreasonable tactic for counsel to forgo presenting an inconsistent defense theory to the jury.  (See *People v. Weaver* (2001) 26 Cal.4th 876, 927; *People v. Wader* (1993) 5 Cal.4th 610, 643.)  There was stronger evidence in support of defense counsel's chosen theory than of any provocation by Erwin or Mario.

In any event, to warrant the reading of CALJIC No. 8.73, there must be substantial evidence from which the jury could find the decision to kill was a direct and immediate response to provocation such that the defendant acted without premeditation and deliberation.  (See *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1705; *People v. Wickersham* (1982) 32 Cal.3d 307, 329, disapproved on another point in *People v. Barton* (1995) 12 Cal.4th 186, 200.)  In the instant case there was no evidence of any conduct by Erwin or Mario that could be classified as provocative or that would evoke an emotional reaction from Burke.  As discussed *ante*, Erwin merely slowed his vehicle to see if one of the obstructing vehicles would move and let him pass.  It was someone in Burke's group who initiated contact by approaching Erwin's car and asking Erwin and Mario what they were doing there.  Mario explained that they were going home, and the man on the sidewalk told Mario and Erwin to leave.  As Erwin began to retreat, Burke got out of a

car, said "That's them" and began firing along with the co-perpetrators. No reasonable juror would find that the act of retreating could be interpreted as a provocative act.

Additionally, Burke suffered no prejudice from the lack of an instruction on provocation. With CALJIC No. 8.66, the trial court instructed the jury on attempted murder and, using CALJIC No. 8.67, on attempted willful, deliberate, and premeditated murder. The premeditation allegation was separate from the attempted murder charge, and the jury was not obliged to find that it was true. Pursuant to CALJIC No. 8.67, the jury was instructed that the prosecution had to prove beyond a reasonable doubt that Burke acted willfully and with deliberation and premeditation. CALJIC No. 8.67 defined "deliberate" as "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action," and defined "premeditated" as "considered beforehand." Further, the instruction required the jury to find a deliberate intent to kill that was "not under a sudden heat of passion," and it explained that "a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation." A jury is presumed to contain intelligent persons capable of understanding and correlating all instructions. (*People v. Matshon* (2012) 210 Cal.App.4th 1297, 1311-1312.) Under the instructions given, the jury, by finding premeditation, rejected the notion that the conditions of the encounter between the Alvarado cousins and Burke prevented Burke from acting with premeditation and deliberation. An instruction specifically directing the jury it could consider provocation in determining whether Burke deliberated and premeditated would not have altered the result.

Finally, the jury found true the allegation that Burke committed the offense for the benefit of, at the direction of, or in association with a criminal street gang and with the specific intent to promote, further, or assist in any criminal conduct by gang members. (CALJIC No. 17.24.2.) This clearly indicated that the jury would have rejected any claim by Burke that he shot at Mario and Erwin because of an unconsidered impulse when he thought he was about to be attacked.

In sum, the record in the instant case does not preclude a satisfactory explanation for counsel's reliance on the mistaken identity defense and for failure to request an instruction on provocation. (*People v. Stewart*, *supra*, 33 Cal.4th at p. 459.) Moreover, Burke suffered no prejudice from counsel's tactics. Therefore, we conclude counsel was not ineffective.

## IV. Fletcher's Credit Days

### A. Fletcher's Argument

Fletcher points out that he was arrested on December 14, 2007, and he remained in custody until sentenced on July 11, 2011. He argues that he should have received 1,306 actual custody days instead of 1,304.

### B. Additional Credit Days Warranted

Fletcher is correct that the actual number of days he spent in custody was 1,306. This includes the day of his arrest and the day of his sentencing. (See *People v. Smith* (1989) 211 Cal.App.3d 523, 526.) Having been convicted of a violent felony, Fletcher is entitled to conduct credits at 15 percent of his actual days in custody. (§§ 667.5, subds. (c)(1), (12), 2933.1.) Accordingly, he is to be granted local conduct credit of 195 days, for a total of 1,501 days of presentence custody credit.

## DISPOSITION

The judgment is modified in Fletcher's case to award him two additional days of actual custody credit for a total of 1,306 actual days. In addition, Fletcher is entitled to 195 days of conduct credit for a total of 1,501 days of presentence custody credit. In all other respects, the judgments are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


BOREN, P.J.

We concur:


CHAVEZ, J.


FERNS, J.*

_____

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.